# UNITED STATES COURT OF APPEALS
## For the Fifth Circuit

No. 01-20514

DAVID ABRAMS, etc.; et al,

Plaintiffs,

YMCA RETIREMENT FUND; HOWARD UNIVERSITY; FEDERATED NATIONAL
INSURANCE COMPANY; HEADWATERS CAPITAL LLC; FRANK D. TIMMONS,

Plaintiffs - Appellants,

VERSUS

BAKER HUGHES INC.; MAX L. LUKENS; GEORGE STEPHEN FINLEY;
ANDREW SZESCILA,

Defendants -Appellees,

E. L. MATTSON,

Appellee.

Appeal from the United States District Court
for the Southern District of Texas

May 21, 2002

Before ALDISERT[1], DAVIS, and PARKER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

The plaintiffs appeal from a dismissal under F.R.C.P. 12(b)(6) of their securities fraud class action under §§10(b) and 20(a) of the Exchange Act. The district court dismissed the case based on its conclusion that the plaintiffs failed to adequately allege particularized facts to establish the necessary element of scienter. Finding no error, we affirm.

---

[1] Circuit Judge, U.S. Court of Appeals for the Third Circuit, sitting by designation.

I.

This securities fraud class action is brought on behalf of all investors who purchased common stock of Baker Hughes from February 1, 1999 through December 8, 1999 (the "Class Period"). Baker Hughes is a diversified oil and gas services company headquartered in Houston, Texas, whose stock trades on the New York Stock Exchange under the symbol "BHI." Defendant Lukens was Baker Hughes' president, chairman and chief operating officer. Defendant George Finley was its chief financial officer. The plaintiffs contend generally that the defendants' Class Period press releases and SEC filings contained false and misleading statements and omissions. Specifically, the plaintiffs allege that the defendants deceived the investing public regarding the adequacy of Baker Hughes' internal financial controls, the fiscal discipline with which the company operated and the company's financial condition. They contend that these misstatements artificially inflated the price of the company's common stock during the Class Period. Thus, they allege that they were harmed when they purchased Baker Hughes stock at artificially high prices.

The Complaint

The complaint contains the following chronology of events and allegations regarding scienter. The complaint alleges that in 1998, Baker Hughes' revenues and earnings were suffering. Years of growth through mergers and acquisitions had left Baker Hughes' accounting systems in disarray, with no unified accounting system and a lack of proper internal controls. The primary problems were in the INTEQ division, located in Venezuela which produced approximately 20% of company revenues. During 1999, Baker Hughes initiated Project Renaissance. The purpose of the project was to cut costs and streamline internal control systems. The project was built around a new information system called SAP which was designed to unify all accounting and data management systems at the company.

2

Problems were encountered in the implementation of the new system which the defendants allegedly kept quiet so as not to jeopardize their incentive compensation or the success of a scheduled $200 million debt offering. During the Class Period internal controls were inadequate and unreliable but the defendants repeatedly touted the adequacy of the company's internal controls. The lack of internal controls caused Baker Hughes to issue false and misleading financial reports throughout the Class Period. Based on the company's reported financial results and the apparent success of the implementation of SAP, the price of Baker Hughes' stock increased throughout the Class Period and analysts upgraded their ratings of the stock.

For example, in March 1999, the company filed its 1998 Form 10-K with the SEC. The report included a letter from the defendants that indicated that the company had in place an extensive system of internal controls to prevent material errors or irregularities in the reports. In May 1999, Baker Hughes announced favorable first quarter results and the stock price rose from $29.785 per share on April 30, 1998 to $31.83 per share on May 3, 1999. Also in May, Schroder & Co., Inc. issued a report raising its rating for Baker Hughes in reliance on a conversation with Baker Hughes management that SAP was on track to produce significantly improved returns. The next day, defendant Finley sold 21,574 shares of Baker Hughes stock at $30.88 per share. Finley was largely responsible for the implementation of SAP. Two weeks later, Finley was appointed chief financial officer and senior vice president of finance and administration.

On May 21, 1999, t he former senior vice president and chief financial officer as well as the controller resigned. Baker Hughes stated that these officials left "to pursue other interests." Platt's Oilgram News reported that the CFO left because of cost overruns and operations glitches associated with the SAP conversion. The resignations raised concerns in the investment community. On the

same day Merrill Lynch issued a favorable report on Baker Hughes based on conversations with management. The report noted the resignations but assured that there are "no accounting issues" at the company. Baker Hughes stock price rose to $31.125 per share. In June 1999, Schoder & Co. issued another favorable report after meetings with defendant Lukens. Baker Hughes price rose $1 per share to $34.5625. On September 27, 1999, Baker filed a shelf registration for the future issuance of debt and equity securities totaling one billion dollars. The plaintiffs claim that it was critical for Baker to raise capital to cover fixed charges that could not be covered by earnings.

The alleged deceptions were brought to light beginning in December, 1999. On December 1, 1999, Baker Hughes announced that results for the 4th quarter would be poor and the company would record a $130 million pre-tax charge to dispose of assets and equipment due to adverse market conditions. On December 8, 1999, the company announced the existence of accounting irregularities at INTEQ, one of its major subsidiaries, that would adversely affect the company's financial statements by $40 to $50 million pre tax. The company canceled the previously announced note offering. On December 9, 1999, Baker Hughes stock closed at $19.25 per share. During the Class Period the stock traded as high as $36.125 per share.

On December 16, 1999, the president of INTEQ resigned. On January 24, 2000, the company's general counsel resigned. On January 31, 2000, Baker Hughes announced that it had fired defendant Lukens from his position as Chairman and Chief executive officer. Also on that day, the company announced that the head of the company's Western Geophysical, Baker Atlas and INTEQ divisions resigned.

On February 17, 2000, the company announced that it would restate previously filed financial reports for periods dating back to December 31, 1997. The restatement reduced profit by $31 million,

4

$24.2 million of which was related to INTEQ. The writeoffs related to uncollectible accounts receivable, inventory write downs and unrecorded employee compensation. More details regarding the writeoffs were disclosed on March 16, 2000 when Baker Hughes filed its 1999 10-K. The report noted that the misstatements "were primarily the result of noncompliance with the Company's accounting and operating procedures and that such noncompliance was isolated primarily to INTEQ's operations in Venezuela." On April 10, 2000, Baker Hughes filed amended quarterly reports for 1999.

The District Court's Decision

The defendants filed a motion to dismiss the case on the grounds that the plaintiffs failed to adequately allege particularized facts as to defendants' scienter and that the plaintiffs failed to show that the alleged misleading public statements were material. Without the benefit of the Zonagen decision, discussed later in this opinion, the district court analyzed case law from this and other circuits and concluded, properly that a strong inference of scienter is not raised where a plaintiff merely alleges facts of a defendants' motive and opportunity to commit fraud. Rather, the plaintiffs must plead specific facts constituting strong circumstantial evidence of conscious misbehavior or recklessness and motive and opportunity may be considered as a factor in determining whether a strong inference has been raised.

The district court proceeded to analyze the three claims raised by the plaintiffs: (1) the defendants had the motive and opportunity to commit fraud based on the need to raise capital, incentive compensation contingent on the successful implementation of SAP and Finley's insider stock sales; (2) the defendants engaged in conscious misbehavior or were reckless as to their public representations because Lukens and Finley were intimately familiar with the company's inadequate

5

internal controls, and (3) the defendants violated generally accepted accounting principles. The district court concluded that the "totality of the Plaintiffs' facts has failed to raise a strong inference of scienter." The court went on to say that although the facts were insufficient in the aggregate, it was not error for the court to compartmentalize the allegations and "wipe the slate clean after considering each component." The district court accordingly dismissed the plaintiffs 10(b) and 10b-5 claims. Because the plaintiffs failed to raise a strong inference of scienter, it declined to reach the issue of materiality. Although not sought by the parties, the district court further held that dismissal of the 10(b) and 10b-5 claims required dismissal of the 20(a) claim.

The plaintiffs appeal.

## II.

This Court reviews a district court's dismissal under Rule 12(b)(6) *de novo*. In doing so, we will accept the facts alleged in the complaint as true and construe the allegations in the light most favorable to the plaintiffs.[2]

To state a claim under §10(b) of the Exchange Act, a plaintiff must show: "(1) a misstatement or omission (2) of a material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury."[3] The scienter, or state of mind element of a § 10(b) claim is a "mental state embracing intent to deceive, manipulate, or defraud."[4] A §10b-5 claim is subject to both Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled "with particularity" and the requirements

---

[2] Nathenson v. Zonagen Inc. , 267 F.3d. 400 (5th Cir. 2001).

[3] Shushany v. Allwaste, Inc., 992 F.2d 517, 520-21 (5th Cir. 1993) (quoting Cyrak v. Lemon, 919 F.2d 320, 325 (5th Cir. 1990).

[4] Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n.12 (1976).

of the requirements of the Private Securities Litigation Reform Act (the "PSLRA"). Under the PSLRA, to allege scienter:

> the complaint shall, with respect to act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.[5]

In addition,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts upon which that belief is formed.[6]

This court's recent decision in Nathenson v. Zonagen Inc. sets the standard of pleading required after the enactment of the PSLRA.[7] That case, which first applied the PSLRA in this circuit, held that "in order to survive a motion to dismiss, a plaintiff alleging a section 10(b)/Rule 10b-5 claim must now plead specific facts giving rise to a 'strong inference' of scienter."[8] As it did before the enactment of the PSLRA, severe recklessness can supply the scienter required to prove securities fraud.[9] Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either

---

[5] 15 U.S.C. § 78u-4(b)(2)(Supp.V. 1999).

[6] Id.

[7] 267 F.3d 400 (5th Cir. 2001).

[8] Id. at 407.

[9] Id. at 408-409.

7

known to the defendant or is so obvious that the defendant must have been aware of it."[10] Allegations of motive and opportunity, standing alone, are no longer sufficient to plead a strong inference of scienter, although appropriate allegations of motive and opportunity may enhance other allegations of scienter.[11] Circumstantial evidence can support a strong inference of scienter.[12] Zonagen also establishes that the effect of the PSLRA "*at a minimum*, incorporates the standard for pleading fraud under Fed. R. Civ. P. 9(b)."[13] This circuit interprets Rule 9(b) strictly, requiring the plaintiff "to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."[14]

Finally, Zonagen suggests that the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter. In analyzing whether the complaint adequately alleged scienter, the court in Zonagen reacted negatively to the district court's consideration of certain statements in isolation.[15] The appropriate analysis, under Zonagen is to consider whether all facts and circumstances "taken together" are sufficient to support the necessary strong inference of scienter on the part of the plaintiffs.[16]

---

[10] Id. at 408, citing Broad v. Rockwell International Corp., 642 F.2d 929, 961-62 (5th Cir. 1981)(*en banc*).

[11] Id. at 410-12.

[12] Id. at 410.

[13] Id. at 412.

[14] Id.

[15] Id. at 424.

[16] Id. at 425.

8

III.

Plaintiffs complain first that the district court erred by failing to analyze their scienter allegations based on the totality of the circumstances alleged as required by Zonagen. The district court stated in its opinion that it was not error for the court to compartmentalize the allegations and "wipe the slate clean after considering each component," citing Coates v. Heartland Wireless Communications, Inc., 55 F.Supp.2d 628 (N.D. Tex. 1999)("Coates II"). However, in its conclusion, the district court also stated that the facts in the complaint were insufficient when viewed in the aggregate. The district court concluded that the "totality of the Plaintiffs' facts has failed to raise a strong inference of scienter." The district court's clear statement that it considered the allegations insufficient in the aggregate, although without analysis, is difficult for us to contradict. We need not do so as we conclude, based on our independent review, that the complaint taken as a whole fails to sufficiently plead scienter and agree with the result reached by the district court.

IV.

We turn now to our analysis of the plaintiffs' complaint. The false and misleading statements alleged in the complaint relate to Baker Hughes' internal accounting and financial controls. Specifically, during the Class Period, the plaintiffs allege that the defendants issued positive representations to the investing community that the disclosures in the company's financial reports were sufficient to make them reasonably accurate. Plaintiffs focus on statements defendants made in the wake of the resignation of two top financial officers, that there were "no accounting issues" at the company. The plaintiffs contend that these statements were false when made as revealed by statements issued by the company beginning in December 1999. They further contend that the defendants knew the statements were false or were severely reckless in making them based on the following

9

circumstantial evidence. First, the individual defendants were senior level executives of Baker Hughes who were intimately familiar with the inner workings of the company, including the inadequacies of its internal controls. Both allegedly received unidentified daily, weekly and monthly financial reports that apprized them of the company's true financial status and had the power and influence to cause Baker Hughes to issue the false statements. The defendants knew that the SAP program was being implemented because the company lacked a single uniform accounting system and thus knew that the company's internal controls lacked cohesiveness. Accounting irregularities discovered mainly at INTEQ necessitated restatement of several previously issued reports. The restatement announced in 2000 was stated to be the result of noncompliance with the company's accounting and operating procedures. Second, the defendants' violations of generally accepted accounting principles ("GAAP") in combination with other allegations raise a strong inference of scienter. Third, the allegations of the defendants' motive and opportunity to commit fraud enhance the strong inference of scienter. The allegations of motive include the need to raise additional capital, a desire to protect their incentive compensation, and insider stock sales.

Based on case law in this and other circuits, these allegations fail to reach the required standard. Plaintiffs point to no allegations that the defendants knew about the internal control problems, only that they should have known or that their lack of knowledge based on the their corporate positions demonstrates recklessness. A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company.[17]

The plaintiffs' allegations regarding non-specific internal reports are also inadequate. An

---

[17]   In re Advanta Corp. Sec. Litig., 180 F. 3d 525, 539 (3d Cir. 1999).

unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss.[18] Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients.[19] Also, the mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information.[20] The plaintiffs point to no specific internal or external report available at the time of the alleged misstatements that would contradict them.

As an example of the type of allegations that survive a motion to dismiss, see Novak v. Kasaks.[21] In that case the complaint alleged that the defendants knew that the company had serious inventory problems that they sought to disguise by adopting a cover up scheme. The defendants acted intentionally and deliberately to artificially inflate the company's financial results in ways that violated the company's internal policies. The complaint in Novak alleged that the defendants "discussed the need to mark down inventory but refused to do so because that would damage the Company's financial prospects."[22] Further the Novak defendants approved an inventory management practice

---

[18]    San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir. N.Y. 1996).

[19]    Janas v. McCracken (In re Silicon Graphics Sec. Litig.), 183 F.3d 970, 985 (9th Cir. 1999).

[20]    Fine v. American Solar King Corp., 919 F.2d 290 (5th Cir. 1990).

[21]    216 F.3d 300 (2d Cir. 2000).

[22]    216 F.3d at 311.

that violated the company's own markdown policy as it was stated in the company's public filings.[23] Also, despite their knowledge that the inventory practice they adopted in violation of stated company policy was the reason for growth in inventory, the defendants in Novak gave false explanations for its growth.[24] We have no such allegations of actual knowledge or intentional or deliberate behavior in this case. Rather the nature of the accounting problems at Baker Hughes that lead to the restatement, i.e. uncollectible accounts receivable, inventory write downs and unrecorded employee compensation, can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action.

This case is more like Melder v. Morris.[25] In Melder, the complaint alleged that "the true adverse facts about URCARCO's financial condition . . . were known to or recklessly disregarded by defendants" and "[b]ecause of their board membership and/or their executive and managerial positions with URCARCO, defendants . . . knew or had access to information concerning the adverse non-public information about URCARCO's adverse financial outlook."[26] In that case this court concluded that the plaintiffs failed to plead scienter adequately.

In our case, the plaintiffs have not pointed to any particular reports or information–available to defendants before the announced financial restatements–that are contrary to the restatements. The fact that Baker Hughes was overhauling its accounting system via Project Renaissance and the SAP program does not command an inference that company officials should have anticipated finding a

---

[23]   Id.

[24]   Id. at 311-312.

[25]   27 F.3d 1097 (5th Cir. 1994).

[26]   Id. at 1103.

problem or assumed that financial data reported under old system was inaccurate. We can just as easily infer that the implementation of SAP was driven by a need to better coordinate the accounting systems in place in various companies Baker Hughes had merged with over the years. A planned improvement or upgrade does not mean that the prior system was necessarily producing bad data. A perfectly reasonable explanation for implementing Project Renaissance was to improve efficiency and lower costs. In discussing the standard for reckless conduct, the court in Novak noted that company officials should not be held responsible for failure to foresee future events. Also, as long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance.[27] The cases relied on by the plaintiffs in this regard involve actual knowledge of the falsity of the published reports, which is not alleged in this case. See Meadows v. SEC, 119 F.3d 1219, 1226 (5th Cir. 1997)(Meadows told investors that certain companies were low-risk investments that were virtually certain to yield a high return without disclosing that he was an officer and director of one of the companies, had been temporarily denied after-hours access to the Companies' books; he had never conducted a background investigation into the principals, any of their assertions, or the Companies' purported successes and that therefore, he had no basis for recommending the investments. Further Meadows was aware one principal of the company had recently been accused of misappropriation; he was aware that a recommendation that they maintain separate bank accounts for each drilling program was not being followed; and he had been forced out of the Companies by certain principals, who also paid him to be silent about the Companies' financial situation.); Serabian v. Amoskeag Bank Shares, 24 F.3d 357, 365 (1st Cir. 1994)(General statement that bank's existing loan review function was not operating

---

[27] Novak, 216 F.3d at 309.

13

timely and of other failures to follow internal policy does not support conclusion that defendants knew loans were deteriorating in creditworthiness. However, bank's statement that loss reserves were adequate, conservative and cautious directly contrary to identified internal reports was sufficient to state a claim.).

Plaintiffs imply that the resignation of key accounting officials from the company in May 1999 should have served as a warning that problems existed within that department and that the defendants were reckless for failing to investigate, especially given their statement that there were "no accounting issues" at the company. However, nothing in the complaint points to any information that would indicate that either the resigning officials, their replacements or other defendants knew of any accounting irregularities or that such irregularities were the reason for their resignations. According to the complaint, Baker Hughes reported that these officials resigned to "pursue other interests." Platt's Oilgram News reported that the CFO resigned because of cost overruns and operational glitches associated with the implementation of SAP. Neither reason has any scienter implications.[28]

V.

In addition, although we acknowledge that allegations of motive and opportunity to commit fraud may enhance an inference of scienter, the motives alleged in the complaint are not the types of motive that support a strong inference of scienter. The plaintiffs allege that the defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation and the desire to sell stock at inflated prices. This court has held that similar allegations were

---

[28] Branca v. Paymentech, Inc. [2000 Transfer Binder] Fed.Sec. L. Rep. (CCH) ¶ 90,911, at 93,855-56 (N.D. Tex. Feb. 8 2000) (Scienter may not be inferred from resignation of company officials "for personal reasons.")

14

insufficient to support an inference of scienter. In Melder v. URCARCO, the plaintiffs claimed that the defendants engaged in a conspiracy to commit securities fraud in order to inflate the price of the company's stock to allow for successful stock offerings, to protect their executive positions and to enhance the value of their personal stock holdings in the company.[29] Absent an allegation that the defendants profited from the inflated stock value or the offerings, such allegations fail. Similar claims were rejected in Tuchman v. DSC Communications Corp.[30] In Tuchman, this court stated:

> Incentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent.[31]

As to the alleged insider stock sales, only one defendant sold only a portion of his shares in the company. Finley exercised and sold 21,574 of 92,405 stock options and sold none of his other 34,980 shares. Only insider trading in suspicious amounts or at suspicious times is probative of scienter.[32] Plaintiffs make no allegations that these sales are out of line with prior trading practices or at times calculated to maximize personal profit.[33] Further, even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period.[34]

---

[29] 27 F.3d 1097, 1102, (5th Cir. 1994).

[30] 14 F.3d 1061, 1068 (5th Cir. 1994).

[31] Id. at 1068-69.

[32] In re Silicon Graphics, 183 F.3d at 987.

[33] Id.

[34] San Leandro, 75 F.3d 801, 814 (2d Cir. 1996).

15

## VI.

In summary, based on our complete review of the plaintiffs' complaint, we conclude that it fails to adequately plead facts that raise a strong inference of scienter. Accordingly, the district court correctly dismissed plaintiffs' action. AFFIRMED.

ROBERT M. PARKER, Circuit Judge, concurring:

In general terms, Plaintiffs allege that Defendants fraudulently misrepresented the effectiveness of Baker Hughes's internal accounting controls, and that Plaintiffs, having relied on these representations, were damaged when the company later revealed the true state of its financial affairs. They contend that as Baker Hughes merged or acquired other entities the accuracy of company-wide accounting practices deteriorated. Methods for reporting asset values and earnings, for example, differed from one business unit to the next. Plaintiffs allege that the lack of a single, coherent accounting practice caused Baker Hughes to issue numbers that did not fairly represent the company's disparate divisions. The consequences of Baker Hughes's growth, from an accounting standpoint, was understood by Defendants, Plaintiffs argue. That they continued to represent the company's financials as accurate anyway evidences severe recklessness.

Allegations like the foregoing, if properly detailed, are sufficient to state a cause of action for securities fraud. A company's public filings are the medium through which stockholders monitor the performance of directors and management. When that conduit is wrongfully obscured owners lose the only reliable means they have for protecting hard-earned capital. History reminds us of the consequences when the financial statements of publically-held companies do not accord with reality. Indeed, it was to protect against them that our nation's securities laws were enacted.

At the same time, we must pay heed to a different set of consequences--those brought about by the overzealous prosecution of specious securities fraud actions. Congress, in passing the Private Securities Litigation Reform Act of 1995, took pains to deter such strike suits. Its findings and

legislative history   suggest that the cost of protecting against fraud was unduly impairing the efficient operation of lawful businesses.  Today, when applying the PSLRA, courts must keep this policy consideration foremost in mind.  But we must also recognize that Congress left unaffected shareholders' right to sue for recompense when they are made the victims of self-dealing and deceit. The PSLRA is a mechanism for winnowing out suits that lack a requisite level of specificity.  It was not meant to let business and management run amuck to the detriment of shareholders.

With respect to the case at hand, I view it as being very close.  Ultimately, however, I like the majority conclude that Plaintiffs' complaint does not pass muster under the stringent standards of the PSLRA.

## I.

The PSLRA did not change the substantive state-of-mind requirement for securities fraud, as we recognized in *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).  As before, severe recklessness will satisfy the scienter element.  *See id.*  What did change was the pleading standard. Now, when alleging scienter, a plaintiff must state particular facts giving rise to a strong inference of severe recklessness.  *See* 15 U.S.C. § 78u-4(b)(2).  Only one circuit has reached a different conclusion. The Ninth Circuit has concluded that under the PSLRA a plaintiff must prove that the defendant was at least deliberately reckless.  *See In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 975-77 (9th Cir. 1999).  Thus, by extension, to survive a motion to dismiss, a plaintiff in that circuit must state facts that give rise to a strong inference of knowing misconduct.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002).  In *Nathenson*, we expressly declined to follow the Ninth Circuit's articulation of scienter.  267 F.3d at 409.  In so doing, we noted that elsewhere in the PSLRA Congress pointedly limited liability to only those misstatements that were made knowingly.  *Id.* (citing

-18-

15 U.S.C. § 78u-5(c)(forward-looking statements) and *id.* § 78u-4(f)(joint-and-several liability)). With respect to one of these limitations, Congress was careful to state that "nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws." 15 U.S.C. § 78u-4(f)(1). And in *Nathenson*, we concluded that Congress's specifying a heightened scienter requirement for those special provisions suggested that it meant to leave alone "the reckless state of mind[] uniformly held sufficient by the federal courts." 267 F.3d at 409 (internal quotations omitted). Thus, there is little room for doubt that in most circuits, and certainly in this one, an allegation of actual knowledge is not required to withstand a motion to dismiss.

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000), cited by the majority here, was a case involving allegations of conscious, intentional fraud. There, defendants supposedly categorized certain out-of-date inventory as "Box and Hold," meaning the company was able to avoid having to write down its value. The inventory, fashionable ladies' attire, depreciated with the times and was likely to sell for only a small fraction of its originally-marked price. In the complaint, defendants were alleged to have led investors and analysts to believe that the company's method of accounting accorded inventory its fair market value. The complaint also alleged that particular (but unnamed) company employees urged defendants to terminate the "Box and Hold" policy; that the defendants in express words refused to comply because of the effect discontinuance would have on the company's stock price; and that defendants effectively maintained two sets of books, thereby hiding from public view the company's inventory practices. The Second Circuit, in reversing dismissal by the district court, concluded, "There is no doubt that this pleading satisfies . . . the requirement of the PSLRA that plaintiffs state facts with particularity that give rise to a strong inference of the required state of mind." *Id.* at 312.

I do not read the majority as citing *Novak* to suggest that it marks a floor for pleading scienter or even necessarily that it is representative of cases that have withstood a motion to dismiss since the PSLRA was enacted. Nevertheless, lest there be any confusion, our conclusion in this case does not rest on Plaintiffs' having failed to set out "allegations of actual knowledge or intentional or deliberate behavior." Maj. Op. at 12. Pleading severe recklessness does not require such contentions.

## II.

I agree that the complaint in this case fails to give rise to a strong inference of scienter, although it is a close question. Taking Plaintiffs' allegations as true, as we are required to do even under the PSLRA, *see Nathenson*, 267 F.3d at 406, the complaint lacks the requisite detail to support a strong inference. For example, Plaintiffs allege that Project Renaissance was initiated "after a decade of merger and acquisition activity[] left the Company's accounting in disarray." Compl. ¶ 41. But little or no facts are offered to support this bald contention. The complaint only specifically mentions one company with which Baker Hughes merged, Western Atlas. Even as to that company, there is no detail about how its and Baker Hughes's accounting practices differed. Companies are required to disclose their methods of accounting. Presumably, comparing Baker Hughes's and Western Atlas's respective reports and filings would have enabled Plaintiffs to explain how the respective accounting practices of each were incompatible, thus resulting in the claimed-of disarray. Plaintiffs could then have proceeded in this fashion with respect to each entity Baker Hughes had acquired over the years. As it stands, however, there is no basis for inferring that Project Renaissance was intended to remedy disparate accounting practices, let alone that such practices were generating faulty numbers. Without facts in this regard, we cannot infer that Defendants were severely reckless in claiming that Baker Hughes's financials were accurate as reported.

Clearly, the closest issue in the case is raised by Plaintiffs' claim that Defendants' statements to certain investment analysts that Baker Hughes had no "accounting issues" or "numbers issues" were fraudulent.[35] These statements were reported the day Baker Hughes's chief financial officer and its comptroller, Eric Mattson and James Harris, both suddenly resigned. The complaint shows that analysts were concerned when Mattson and Harris unexpectedly left. Baker Hughes's nebulous explanation for their leaving--that they wanted "to pursue other interests"--likely did little to mollify the situation. But Plaintiffs have failed explain how these events standing alone support a strong inference that the discovery of accounting irregularities precipitated Mattson's and Harris's leaving. Several months later, a report in *Platt's Oilgram News* attributed the departures to cost overruns in the implementation of Project Renaissance. No facts have been alleged that would undermine this explanation. Moreover, assuming for the moment that faulty accounting practices were the reason Mattson and Harris left, Plaintiffs have failed to make particular allegations about how evidence of the problem had made its way to Defendants. Plaintiffs argue that "Individual Defendants each received daily, weekly[,] and monthly financial reports to apprise them of the true financial status of Baker Hughes." Compl. ¶ 95. No back-up support is given for this contention, however. It would be easier to infer that they had received such reports if, for example, we were given information about who generated the reports, when they were reviewed, how Defendants responded to them, etc. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 70-72 (2d Cir. 2001). Not having this information

___

[35] Not before us is the question whether statements to third-party analysts are actionable. *See, e.g.*, *Novak*, 216 F.3d at 314-15. Also not before us is whether allegedly false statements reported by analysts but not attributed to a particular person are actionable. *See, e.g.*, *Florida St. Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 667-69 (8th Cir. 2001).

makes it difficult to say whether Defendants were reckless in misrepresenting Baker Hughes's accounting controls.

As we concluded in *Nathenson*, allegations of motive and opportunity on the part of a defendant may in some cases contribute to a strong showing of scienter. 267 F.3d at 412. In reaching this conclusion, we suggested that the usefulness of such allegations depends on the facts of the case at hand. *Id.* at 411-12. Along these lines, we refused to adopt any hard-and-fast rule regarding the circumstances in which a strong inference of scienter can be drawn from the existence of motive and opportunity. In this case, I agree with my colleagues that Defendant Finley's exercising 23% of the stock options he owned at the time does not in a material way contribute to reaching the strong-inference standard. In *Florida State Board of Administration v. Green Tree Financial Corp.*, the Eighth Circuit determined that an "unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard." 270 F.3d at 660. Here, Finley's trading activity was not "unusual or heightened." But I believe that it is not necessary to flatly state, as the majority does, that "[o]nly insider trading in suspicious amounts or at suspicious times is probative of scienter." Maj. Op. at 15. A case-specific evaluation of each complaint is better than absolute rules. I likewise think the majority goes too far in stating, "Further, even unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period." *Id.* at 15-16. Again, determining in advance which situations support an inference of scienter is getting away from the precepts of *Nathenson*. Moreover, such an inference against one defendant ought not turn on a finding that his co-defendant likewise profited from illegal insider trading. *See, e.g*, *Green Tree*, 270 F.3d at 664-65.

Two other areas bear mention. In *Nathenson*, we concluded that the size and organization of

the defendant company, together with the position of the individual defendant within it, supported an inference of scienter. There, we noted that the defendant was the chief executive of what "was essentially a one product company." 267 F.3d. at 424-25. Given that the company's fortunes would rise or fall based on the success of that single product, we deduced that that misstatements concerning it were more likely to have been made with scienter. In this case, Plaintiffs note that Baker Hughes's INTEQ division, which was allegedly the source of the accounting irregularities in this case, accounted for 20% of the company's revenues. That is not an insignificant fraction. At the same time, as the complaint notes, Baker Hughes has eight other divisions with operations worldwide. Defendants' understanding of the INTEQ situation therefore cannot be so easily inferred. Second, the size of the accounting restatement was relatively modest when compared to Baker Hughes's revenues and profits generally. As such, inferring recklessness by Defendants is more difficult. *Cf. Green Tree*, 270 F.3d at 666 ("[T]he sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing.")