# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 13, 2016

Lyle W. Cayce
Clerk

No. 14-41141

LOCAL 731 I.B. OF T. EXCAVATORS AND PAVERS PENSION TRUST
FUND,

> Plaintiff - Appellant

v.

DIODES, INCORPORATED; KEH-SHEW LU; RICHARD WHITE,

> Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, SMITH, and SOUTHWICK, Circuit Judges.

EDITH H. JONES, Circuit Judge:

A putative class of purchasers of Diodes, Inc. ("Diodes") common stock sued Diodes and two of its corporate officers alleging that Diodes and its officers committed securities law violations between February and June, 2011. Despite publicly admitting that labor problems existed at its Shanghai production facility, and accurately predicting the impact of the problems on its quarterly financial results, Diodes is alleged to have omitted significant information about the extent and causes of the problems. Diodes moved to dismiss the complaint for failure to state a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), and the district court granted the motion. We affirm the judgment.

No. 14-41141

The complaint does not adequately allege facts from which a "strong inference of scienter" may be drawn against Diodes and the individual defendants.

## BACKGROUND

Diodes, headquartered in Plano, Texas, is a manufacturer and seller of semiconductor devices. Though it has factories around the world, most of its employees are located in Asia, where it produces and packages its semiconductors. On February 9, 2011, Diodes issued a press release announcing its financial results for the fourth quarter and fiscal year 2010, as well as looking ahead to the first quarter of 2011. In this press release, defendant Keh-Shew Lu ("Lu"), the company CEO, alerted investors that Diodes's manufacturing output in the first quarter would be affected by labor shortages in China. As a result, Lu predicted that revenue would be flat or down 5 percentage points compared to the fourth quarter of 2010 and that gross profit margin would be 36.5 percent, plus or minus 1 percent.

Following the press release, Lu further elaborated on the labor shortage problems in a conference call with analysts and attributed it to the recently announced Chinese policy seeking to drive economic development inland and the Chinese New Year holiday. Despite these obstacles, Lu predicted that the problem would be resolved by the second quarter of 2011, noting that Diodes started hiring new workers, but cautioning that it takes six to eight weeks of training before they would be productive.

On May 10, 2011, Diodes issued a press release reporting on its first quarter results. Notably, Diodes's gross profit margin for the first quarter was 35.5 percent, meaning that Lu's prediction in February 2011 was accurate. In the press release, Diodes again noted that its first quarter output was affected by the Chinese labor shortage, and a "larger than normal" number of workers did not return to work after the Chinese New Year holiday. Nonetheless, Diodes reiterated that it was continuing to hire new workers to deal with the

2

problems caused by the labor shortage.  In a conference call following the press release, Lu stated that Diodes expected the labor shortage issues to be resolved during the second quarter and that the second quarter gross profit margin would be comparable to the first quarter margin.  On the same day, defendant Richard White ("White"), Diodes's CFO, spoke at an industry conference where he answered questions about the labor shortage.  He stated that Diodes noticed the problem around the Chinese New Year and that it was replacing non-returning workers; he also cautioned that it takes six to eight weeks for a new worker to be fully trained and up to six months before the worker becomes fully efficient.  Following these announcements, Diodes's stock price dropped.

On June 9, 2011, Diodes revised its guidance for the second quarter and lowered its gross margin prediction to 32.5 percent, plus or minus 1.5 percent. Diodes stated that this adjustment was due in part to a "slower than expected" recovery from the labor shortage problem in China.  Following this announcement, the stock price fell again.  Notably, an August 2011 press release following the second quarter reported that Diodes's gross margin for the second quarter was 32.8 percent.  Diodes's management accurately predicted its gross profit margin for the second quarter.

Almost two years later, on March 15, 2013, the plaintiff pension fund ("the Fund") filed this securities fraud class action against Diodes, CEO Lu and CFO White.  Plaintiff's amended complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, Securities and Exchange Commission ("SEC") Rule 10(b)-5, and Section 20(a) of the Exchange Act (the control person provision).  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a). The class period spans February 9 to June 9, 2011, and the complaint's core allegations home in on the series of press releases and statements made by Lu and White during that period.  There is no allegation of any false statement. The Fund contends instead that Diodes's alleged omissions evince intentional

3

No. 14-41141

or severely reckless conduct that misled investors and creates a strong inference of scienter against Defendants. Three arguments support this contention. First, it is implausible that Lu and White, as top company officials, did not know about the Chinese labor shortage in a facility critical to Diodes's profitability. They must have known about or consciously disregarded the scope of the problem and that the labor shortage was principally caused by company policies that alienated workers and caused them to quit. Second, Diodes's early shipment of orders to customers in January 2011 implies an attempt to conceal the severity and duration of the labor shortage. Third, Lu's and other insiders' stock sales during the class period strongly support an inference of scienter.[1]

The district court thoughtfully explained its decision granting Diodes's motion to dismiss for failure to state a claim. Fed. R. Civ. Pr. 12(b)(6). The court held, in essence, that the complaint insufficiently alleged facts to establish an inference of scienter under the PSLRA's heightened pleading requirements. The Fund timely appealed.

## DISCUSSION

We review a district court's ruling on a motion to dismiss *de novo*. *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014). A plaintiff's complaint will survive a Rule 12(b)(6) motion to dismiss if, accepting its factual allegations as true, the complaint plausibly states a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where, as here, the complaint involves an allegation of fraud, Federal Rule of Civil Procedure 9(b) imposes a higher standard on the complainant, requiring that he plead with "particularity the circumstances constituting fraud." The PSLRA has raised

---

[1] On appeal, the Fund relies only on Lu's trades and has abandoned complaints about others' stock sales in the wake of the district court's adverse reasoning.

the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways. *Indiana Elec. Workers Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2007). First the plaintiff must "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Id.* (citing 15 U.S.C. § 78u-4(b)(1)(B)). Second, "for 'each act or omission alleged' to be false or misleading, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.'" *Id.* (citing 15 U.S.C. § 78u-4(b)(2)).

The elements of securities fraud claims include a material misstatement or omission; a defendant acting with "scienter" concerning the fraud; reliance; damages; and loss causation. *Indiana Elec.*, 537 F.3d at 532 (citations omitted). Although the appellees challenge the elements of scienter and materiality, we need consider only scienter.

In evaluating a complaint's scienter allegations, a court must "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). A three-step framework guides this holistic evaluation. First, the factual allegations in the pleadings must be accepted as true. *Indiana Elec.*, 537 F.3d at 533 (citing *Tellabs*, 551 U.S. at 322). Second, the court must consider the entire complaint, including documents incorporated into the complaint by reference and matters subject to judicial notice. *Id.* Third, the court must consider plausible inferences supporting as well as opposing a strong inference of scienter. *Id.* (citing *Tellabs*, 551 U.S. at 323). Ultimately, in order to create an inference of scienter, the allegations in the complaint must be "cogent and compelling," not simply "reasonable," or "permissible." *Id.* A court may employ a "two-step method" by first assessing each allegation individually and then considering the allegations as a whole. *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015).

5

Scienter in a securities fraud case connotes "an intent to deceive, manipulate, defraud or severe recklessness." *Id.* at 536 (internal brackets and citation omitted). Severe recklessness is marked by "an extreme departure from the standard of ordinary care," and "is limited to highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence." *Id.* (citing *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)). Indeed, severe recklessness is only present in situations where there is "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.*

Consequently, "allegations of motive and opportunity standing alone will not suffice," though such circumstantial evidence can "enhance the strength of the inference of scienter." *Indiana Elec.*, 537 F.3d at 533 (internal citation omitted). Moreover, this court has rejected the "group pleading approach to scienter," and focuses on the state of mind of the corporate officials who make, issue, or approve the statement rather than the "collective knowledge of all the corporation's officers and employees." *Id.* (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 368 (5th Cir. 2004)).

The Fund does not allege that it has direct proof of intentional or severely reckless omissions of material facts on the part of Diodes or its corporate executives. Rather, the Fund argues that circumstantial evidence supports a strong inference of scienter. First, the Fund argues that, as top company executives, Lu and White knew the profound importance of the Shanghai facility to Diodes, and accordingly, they must have known (or were severely reckless in not knowing) that their internal labor policies would exacerbate the labor problems' length and severity. These are allegedly "special circumstances" giving rise to the strong inference of scienter. Second, the Fund argues that Diodes's early shipments of customer orders in January 2011 imply

an attempt to conceal the extent of the problems caused by the labor shortage and provide another basis for the strong inference of scienter. Finally, the Fund argues that Lu's stock sales during the class period constitute a powerful reason for inferring scienter. We consider each argument in turn.

### A. Special Circumstances

The Fund asserts that the labor shortage affecting Diodes's Shanghai facility was due principally to Diodes's own harsh labor practices that alienated workers and caused them to quit. The company allegedly doubled work hours and restricted employee leave before the Chinese New Year. [2] Because an experienced workforce is essential to Diodes's competitive advantage, the Fund reasons, Lu and White must have been aware of how these internal labor policies exacerbated the external influences on the company's productivity. Since Lu did not reveal the contribution of company-specific policies to the labor shortage in press releases and conference calls during the class period, it

---

[2] For purposes of this analysis, we assume *arguendo* that the allegations of the Confidential Witnesses in the complaint may be considered in determining the complaint's sufficiency. However, the allegations of some of the witnesses, particularly those on the factory floor, give us pause.

Allegations by confidential sources "afford no basis for drawing the plausible competing inferences required by *Tellabs*." *Indiana Elec.*, 537 F.3d at 535. "At the very least, such sources must be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded." *Id.* (internal quotations and citations omitted). We doubt that the allegations by the confidential witnesses on the factory floor—CWs 1, 2, 3, and 4—satisfy this standard. First, it is unclear from the descriptions of these witnesses, all former employees, whether their employment status at the Shanghai facility conferred sufficient insights into the effect of the company policies on the 2,000 person labor force as a whole. Even accepting that these witnesses occupied some kind of supervisory positions, it is far from clear that their anecdotal statements about the reasons for the departure of a few employees can be imputed to the workforce beyond their departments. Moreover, there is no way to compare the CW statements about employee departures with (a) prior experiences at the Diodes facility or (b) other Shanghai production companies.

can be inferred that he was attempting to conceal the extent and duration of the problem from investors.

It is important to note the curious nature of the Fund's claims. To recap the relevant facts: during the class period, Diodes repeatedly warned investors of a labor shortage that would affect its output in the first two quarters of 2011; Diodes *accurately* warned the precise impact this labor shortage would have on its financial results, not once, but twice. Yet the Fund contends that more disclosure was required. Most reasonable investors would rather receive an accurate "bottom line" assessment of a disclosed company problem than all of its assumptions and nuances. Even assuming, however, that a case can theoretically be made for more disclosure, the Fund's pleadings are insufficient to support its contention.

As an initial matter, the Fund's amended complaint pleads no facts indicating that Lu and White knew that the labor shortage was principally caused by Diodes's workplace policies. The complaint does not allege that Lu and White knew (a) that there were new policies, (b) that workers were upset about the new policies, or (c) that workers were quitting for that reason. Nor does the complaint allege that Lu's or White's views on the expected extent or duration of the labor shortage were any different from their public statements. Rather, the Fund contends that a strong inference of scienter can be drawn simply from the magnitude of disruption caused by the company's labor policies, which, from their top executive positions, Lu and White must or should have known about. Accordingly, their concealment of the facts from investors must have been intentional or severely reckless.

The Fund, however, candidly acknowledges the predominant theme in this circuit's case law that "an officer's position with a company does not suffice to create an inference of scienter." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 424 (5th Cir. 2001); *see also Indiana Elec.*, 537 F.3d at 535; *Abrams*, 292 F.3d

No. 14-41141

at 432.  Indeed, it is the "rare case" where motive and opportunity allegations alone can support a strong inference of scienter.  *Owens*, 789 F.3d at 539-40.  Nonetheless, the Fund seizes upon a handful of cases in which special circumstances, "taken together with an officer's position, may support a strong inference of scienter," *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008).  On analysis, the special circumstances cases are inapposite.

The "special circumstances" cases exhibit some combination of four considerations that might tip the scales in favor of an inference of scienter.  First, the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day operations.  *Dorsey*, 540 F.3d at 342 (no employees); *Nathenson*, 267 F.3d at 425 (32 to 35 employees).  Second, the transaction at issue may have been critical to the company's continued vitality.  *Dorsey*, 540 F.3d at 342; *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005); *Nathenson*, 267 F.3d at 425.  Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker.  *Dorsey*, 540 F.3d at 342; *Plotkin*, 407 F.3d at 700; *Nathenson*, 267 F.3d at 425.  Fourth, the defendant's statements were internally inconsistent with one another.  *Plotkin*, 407 F.3d at 700; *Nathenson*, 267 F.3d at 425.

None of these considerations is present here.  Diodes is a large company with over 4,000 employees at locations across the world.  It is not at all clear that Diodes's top executives in Dallas would have been aware of labor policies at the Shanghai facility, much less the chatter on the factory floor and the varying reasons for employee attrition before and after the Chinese New Year.

Second, although the efficiency of Diodes's production and packaging of semiconductors is key to its competitive advantage, the Fund does not allege that the extent and duration of the labor shortage, whatever its cause, jeopardized the company's existence.  In contrast, a strong inference of scienter

9

could be drawn where a biopharmaceutical company allegedly falsely stated that it had acquired a patent covering its single product. *Nathenson*, 267 F.3d at 425. Similarly, omissions concerning the poor financial condition of a technology company's contractual counterparty allowed a strong inference of scienter because the counterparty's weakness posed a serious risk to the company's long-term existence, and it had predicted that the contracts would bring in millions of dollars. *Plotkin*, 407 F.3d at 700.

Third, whether Diodes's workplace conditions "profoundly" contributed to the labor shortage is an adverb, not a factual assertion. The proximity of Diodes's new policies in early 2011 to China's new economic initiatives and the Chinese New Year makes it difficult to isolate the effect of the workplace policies on the factory floor. The company policies' impact could not have been readily apparent to Lu and White. Finally, the defendants' statements were both consistent and accurate: management consistently maintained that labor shortages were affecting its output and accurately predicted the impact that this shortage would have on the company's financial results.

## B. Early Product Shipment

The Fund seeks to draw a strong inference of scienter from Diodes's early shipments of orders without prior customer authorization. The practice, it contends, indicates that Diodes intended to conceal the true impact of the labor problems from the public and to deceive investors by artificially pushing forward its earnings. This argument is beset with difficulties, not the least of which is that early shipping is a legal[3] practice that may be supported by "any number of legitimate reasons," and usually "does not support a strong

---

[3] We note that the Fund has not alleged that the early shipments at issue were fabricated, nor does it allege that Diodes's accounting of those sales violated GAAP or other applicable accounting principles. Thus, it appears from the pleadings that the Fund does not contest that Diodes's early shipments of orders were legal.

inference of scienter." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999).

To be sure, allegations that a defendant is concealing company problems to inflate earnings may create the inference when the complaint alleges that the defendant had "actual knowledge" of the problems and engaged in "deliberate or intentional behavior" to conceal them. *Abrams*, 292 F.3d at 432-33. Fatal to the Fund's argument, however, are two facts noted previously. First, Diodes did not attempt to conceal the labor shortage problem—it repeatedly alerted investors that labor issues would affect the company's output and correctly predicted the extent to which these issues would affect the company's bottom line. Second, the amended complaint offers no specific facts that Lu and White had "actual knowledge" that the labor shortage was caused by company-specific problems.

In any event, as the district court observed, shipping orders early would tend to enhance the labor shortage problem, not disguise it. Because shipping orders early would deplete the inventory, Diodes's ensuing inability to keep up with orders would quickly become apparent, and its revenue and gross profit margin would decrease. Were Diodes attempting to conceal a severe labor shortage problem, shipping orders early would be counterproductive. Diodes's theory is neither "compelling" nor "cogent." *Tellabs*, 551 U.S. at 323.

## C. Insider Trading Allegation

The Fund's final allegation centers on Lu's stock sales during the class period. It argues that his sales confirm Diodes's misleading of stockholders because they occurred before the May 2011 announcement of the lingering labor shortage problem and were not plagued by the stock price decline following the May 2011 press release.

Because corporate executives, whose compensation often includes company stock, "will trade those securities in the normal course of events," *In*

No. 14-41141

*re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) (Alito, J.), insider trading, by itself, "cannot create a strong inference of scienter, but it may meaningfully enhance the strength of the inference of scienter." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) (internal quotation omitted). Insider stock sales can enhance an inference of scienter if the trading occurs "at suspicious times or in suspicious amounts." *Cent. Laborers'*, 497 F.3d at 552. A trade is suspicious if "sales are out of line with prior trading practices or at times calculated to maximize personal profit." *Id.* at 553 (citing *Abrams*, 292 F.3d at 435). This court has repeatedly cautioned, however, that "even unusual sales by one insider do not give rise to scienter when other defendants do not sell some or all of their shares during the Class Period." *Abrams*, 292 F.3d at 435; *see also Southland Sec. Corp.*, 365 F.3d at 369 ("The fact that other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit."). Importantly, a court must consider "both culpable and nonculpable explanations for stock sales, as revealed in the pleadings and associated documents." *Indiana Elec.*, 537 F.3d at 543.

Viewed in isolation, Lu's sales during the class period might be considered suspicious. They are out of line with his prior trades, which were infrequent and in much smaller amounts. On the other hand, Lu sold only 12.1 percent of his Diodes shares, leaving 87.9 percent of his holdings, worth millions of dollars, invested in the company. Moreover, although other non-defendant insiders sold Diodes stock during the class period, there is no basis to infer that those trades were suspicious absent allegations about the individuals' prior trading practices. The district court actually rejected any adverse inferences about White's sales of a meager 1.7 percent of his stock during the class period, a conclusion not challenged by the Fund on appeal.

No. 14-41141

On the allegations before us, Lu's significant stock sales alone will not support a strong inference that he either knew the importance to investors of the company-specific contributions to the labor shortage or was severely reckless in his ignorance. *See Cent. Laborers*, 497 F.3d at 553. The sales represented a small portion of his investment in the company, and there are many innocent reasons why an individual would sell stock at a given time. Thus, the nonculpable inferences that may be drawn from sales of stock are more cogent and compelling than the Fund's contrary proposition.

### D. Totality of the Circumstances

Whether viewing the above three classes of allegations individually or as a whole, the Fund has inadequately pled facts in its amended complaint that give rise to a strong inference of scienter on the part of the defendants. *Tellabs*, 551 U.S. at 323; *Indiana Elec.*, 537 F.3d at 533. The Fund's amended complaint fails to satisfy the PSLRA's requirement to plead with particularity facts supporting a strong inference concerning the defendants' requisite state of mind. 15 U.S.C. § 78u-4(b)(2).

### CONCLUSION

Because the Fund's amended complaint fails to plead facts giving rise to a strong inference of scienter on the part of the defendants, we **AFFIRM** the district court's judgment dismissing the case.

13