# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-31094

United States Court of Appeals
Fifth Circuit

**FILED**
April 21, 2017

Lyle W. Cayce
Clerk

BRIAN M. NEIMAN; WILLIAM KRUSE; and THE MOSHE ISSAC FOUNDATION, Individually and on behalf of all others similarly situated,

Plaintiffs - Appellants

v.

T. PAUL BULMAHN; ALBERT L. REESE, JR.; KEITH R. GODWIN; LELAND E. TATE,

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, ELROD, and HIGGINSON, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

This securities class action concerns ATP Oil & Gas Corporation's ("ATP") collapse into bankruptcy. Plaintiffs-Appellants were shareholders of ATP, a company engaged in the acquisition, development, and production of oil and gas properties. Plaintiffs allege that Defendants, each of whom was an officer or director of ATP, misrepresented (1) the production of Well 941 #4 ("Well #4") (a new well that ATP brought online in 2011), (2) ATP's liquidity and whether the company had the available funds to complete the Clipper pipeline (a pipeline project that ATP anticipated completing in late 2012), and (3) the true reason that Matt McCarroll resigned as CEO of ATP. The district

No. 15-31094

court dismissed Plaintiffs' Second Amended Complaint with prejudice. Plaintiffs appealed. We AFFIRM.

I

**A. ATP**

ATP was a Texas company that developed oil and gas properties. As of March 2010, ATP had an interest in 104 wells in the Gulf of Mexico. Defendants were each officers of ATP. Defendant T. Paul Bulmahn served as Chairman, Chief Executive Officer, and director of ATP from May 2008 through the bankruptcy. Defendant Albert L. Reese, Jr., served as CFO of ATP from March 1999 through the bankruptcy. Defendant Keith R. Godwin served as ATP's Chief Accounting Officer from April 2004 through the bankruptcy. Defendant Leland E. Tate served as President of ATP from May 2008 through the bankruptcy.

**B. Well #4**

In August 2011, ATP began production from Well #4. ATP stated that "[t]he well delivered on ATP's original expectations with an initial rate exceeding 7,000 Boe [barrels of oil equivalent] per day . . . . Company-wide production now exceeds 31,000 Boe per day."

On September 12, 2011, Reese re-stated that ATP projected its total production at 31,000 Boe per day. On September 26, 2011, Moody's Investors Service issued a report, which claimed that ATP's cash flow was "not sufficient to cover" ATP's outstanding notes. Reese responded to the Moody's article on September 29, 2011, stating, "I can't fight rumors or reports, all I can do is continue to deliver on the promises we've made. Our expectation is that everything is going to be fine."

Plaintiffs claim that both of Reese's statements were false and misleading because Well #4 actually was producing far less than the projected

7,000 Boe per day. In November 2011, ATP disclosed that Well #4 actually was producing 3,500 Boe per day.

## C. ATP's Liquidity and Financial Condition

Plaintiffs raise a number of allegations concerning Defendants' representations that ATP's liquidity and financial condition were solid from 2010 to 2012. Throughout the period, Defendants routinely stated that ATP had sufficient liquidity to meet its capital needs. Plaintiffs allege that each of these statements was false or misleading, arguing that in fact from 2010 to 2012, ATP's financial condition was worsening and its liquidity position was crumbling. In support, Plaintiffs first point to Reese's testimony at ATP's bankruptcy hearing where Reese testified that ATP was "facing a severe liquidity crisis[.]" Second, Plaintiffs argue that ATP's reliance on financing signaled its imminent liquidity crisis. Namely, Plaintiffs allege that beginning in April 2010, ATP was forced to sell a significant portion of future production from its wells (in the form of overriding royalty interests ("ORRIs") and net profit interests ("NPIs")—financial instruments that sell a percentage of future income from an asset) to finance drilling projects. In support, Plaintiffs cite Confidential Witness Three ("CW3"), a certified public accountant who worked in ATP's accounting and finance department from June 2010 to October 2011, and who observed that "even if [ATP's wells] produced like gangbusters, they don't have a right to that money—their cash flows are already spoken for." Third, Confidential Witness Four ("CW4"), the Vice President of Production at ATP from June 2001 until October 2013, additionally noted that during the class period, ATP often delayed maintenance work and payments to vendors in order to manage cash flow. Indeed, by May 2012, ATP's cash position became so strained that it withheld approximately $23.2 million in ORRI and NPI payments in order to stave off bankruptcy.

No. 15-31094

## D. The Clipper Project

Up until its bankruptcy, ATP was developing the Clipper wells in the Gulf of Mexico. ATP believed that the Clipper wells held plentiful reserves. However, to monetize those reserves ATP needed to build a pipeline connecting the Clipper wells to the nearest oil production platform. The total cost of completing the Clipper pipeline was estimated at between $140 million and $150 million. ATP's management believed that the revenue from the Clipper wells would alleviate ATP's poor financial condition. ATP's management routinely touted the Clipper project's potential revenue. Plaintiffs allege that each of these statements was false and misleading because ATP did not have the available capital or access to capital necessary to complete the Clipper pipeline.

## E. Matt McCarroll's Resignation

On June 1, 2012, ATP issued a press release announcing that Matt McCarroll had been hired as CEO, replacing Defendant Bulmahn. Six days later, on June 7, 2012, ATP issued a second press release announcing that ATP "was unable to reach a mutually agreeable employment agreement with Mr. McCarroll and effective today he has submitted his resignation." Defendants Bulmahn and Reese were listed as individuals to contact on both press releases.

Plaintiffs contend that the reason given for McCarroll's resignation was false or misleading. According to Plaintiffs, the true reason for McCarroll's departure was that McCarroll discovered ATP's financial weaknesses and wanted to begin restructuring immediately, but the ATP Board would not agree.

II

"We review de novo the district court's dismissal of the securities fraud complaint . . . ." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). "A

plaintiff's complaint will survive a Rule 12(b)(6) motion to dismiss if, accepting its factual allegations as true, the complaint plausibly states a claim for relief." *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where, as here, the complaint involves an allegation of fraud, Federal Rule of Civil Procedure 9(b) imposes a higher standard on the complainant, requiring that he plead with 'particularity the circumstances constituting fraud.'" *Id.* "The PSLRA has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Id.* (citing *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)). "First the plaintiff must 'specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading.'" *Id.* (citing *Shaw Grp.*, 537 F.3d at 533). "Second, 'for each act or omission alleged to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind.'" *Id.* (quoting *Shaw Grp.*, 537 F.3d at 533).

Plaintiffs assert two claims. Count One alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Count Two alleges that Defendants are liable as control persons under Section 20(a) of the Exchange Act.

To state a claim under Rule 10b–5 "a plaintiff must allege, in connection with the purchase or sale of securities, '(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir. 2001) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 244 (5th Cir. 2003).

No. 15-31094

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b–5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u–4(b)(1) & 78u–4(b)(3)(A) [the PSLRA]: (1) specify . . . each statement alleged to have been misleading, i.e., contended to be fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Goldstein*, 340 F.3d at 245 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

"Under Section 20(a), a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 n.4 (5th Cir. 2009). Nonetheless, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).

### III

**A. Reese's Statements**

Broadly, Plaintiffs' scienter theory with respect to Reese's statements about Well #4's production is that prior to speaking on September 12 or September 29, Reese knew, or was severely reckless in not knowing, that Well #4's production had dropped. Plaintiffs ground this theory in three sources: (1) Reese's purported motive to deceive investors, (2) allegations made by certain

confidential witnesses, and (3) Reese's high rank in the company. The district court rejected Plaintiffs' scienter theory. We agree.

"'Scienter' is 'a mental state embracing intent to deceive, manipulate, or defraud[.]'" *Goldstein*, 340 F.3d at 245 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). "[P]laintiffs can demonstrate scienter by a showing of 'severe recklessness' . . . ." *Id.*

> [Severe recklessness] is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014) (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003)).

"[W]e must look to the Complaint *in toto* in deciding whether it adequately pleads scienter." *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 263 (5th Cir. 2005), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005) (citing *Goldstein*, 240 F.3d at 246–47). "A three-step framework guides this . . . evaluation. First, the factual allegations in the pleadings must be accepted as true. Second, the court must consider the entire complaint . . . . Third, the court must consider plausible inferences supporting as well as opposing a strong inference of scienter." *Diodes*, 810 F.3d at 956–57 (internal citations omitted). "Ultimately, in order to create an inference of scienter, the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.'" *Id.* at 957 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).

Plaintiffs' scienter allegations fall short for three reasons. First, Plaintiffs have failed adequately to plead that Reese had a motive to mislead

the public in September 2011. The fact that ATP disclosed the true production of Well #4 in November 2011, just two months after Reese's statements, belies an inference of scienter. On November 9, 2011, Tate stated

> As we brought [Well #4] on production, what we saw was a completion efficiency where there was more wellbore drawdown near the well bore than what we had seen during the well test and as a result we can make on a routine basis about 3,500 barrels a day equivalent out of that well.

It would have made little sense for Reese to lie about Well #4's production in September only for Tate to disclose the true production in November. This is especially true because Plaintiffs have not alleged that Reese had a particular reason to lie in September that would have vanished by November. For example, Plaintiffs do not allege that Reese inflated ATP's production numbers in September in order to facilitate an important business opportunity that was no longer salient in November. Instead, Plaintiffs allege that throughout Fall 2011, ATP's fiscal position continually worsened.

Plaintiffs' contrary suggestion that Reese had a motive to lie is not supported by our case law. We have found that "[t]he desire to raise capital in the normal course of business does not support a strong inference of scienter because virtually all corporate insiders share this goal." *Owens v. Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002)). The "outlier" to this proposition is *Goldstein* where this court found that the company's "need to complete a 'crucial' $129 billion merger . . . gave the company a motive to inflate its financial results." *Shaw Grp.*, 537 F.3d at 544 (quoting *Goldstein*, 340 F.3d at 242, 250).

Plaintiffs do not explain with any specificity why, in September 2011, when Reese spoke, ATP had a more than routine need to raise capital. For example, Plaintiffs have not alleged that in September 2011, ATP was in

critical negotiations to facilitate financing or to seek out potential creditors. Rather, Plaintiffs' allegations indicate that in September 2011, ATP could easily access credit, and, indeed, did so many times.

Although lack of motive is not fatal to Plaintiffs' claim, "[w]here, as here, the plaintiff[s have] not alleged a clear motive for the alleged misstatements or omissions, the strength of [the] circumstantial evidence of scienter must be correspondingly greater." *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005).

Second, Plaintiffs' Confidential Witness allegations fall short. All that Plaintiffs' Confidential Witness allegations indicate is that reports were made available to Reese, which showed that Well #4 was not producing 7,000 Boe per day. Plaintiffs have not directly alleged that Reese actually read the reports or was otherwise made aware of the lower production. The allegation that CW4 claims to have been confident that Reese knew of the production numbers does not plausibly allege Reese's knowledge because Plaintiffs fail to plead any basis for CW4's confidence. Thus, the critical question is whether it is proper to infer that Reese was made aware, or was severely reckless in not being aware, of Well #4's lower production.

Our precedent indicates that for allegations concerning internal corporate reports alone to support a strong inference of scienter (1) the complaint must have "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients[,]" *Abrams*, 292 F.3d at 432, and (2) the corporate reports be connected to the speaking executive in a persuasive way, *see Goldstein*, 340 F.3d at 251–52.

Plaintiffs' allegations fail on the second element. Plaintiffs allege that Reese received weekly emails containing production reports. Plaintiffs do not directly allege, however, that Reese read the relevant section of the reports before he made either his September 12 or September 29 statements. Instead,

No. 15-31094

Plaintiffs ask the court to infer that Reese either actually reviewed the production reports, or was severely reckless in not doing so, from the fact that he received them.

*Goldstein* comes the closest to defining when a plaintiff adequately alleges that an executive has knowledge of a report. 340 F.3d 238. There, the plaintiffs alleged that two executives, Ebbers and Sullivan, misstated WorldCom's financial position by failing to write off over $500 million of uncollectable accounts receivable. *Id.* at 243–44. In support of their scienter allegations, plaintiffs alleged that WorldCom's legal department prepared a monthly list of delinquent accounts. *Id.* at 251. Plaintiffs alleged that the list should have alerted Ebbers and Sullivan to the need for a write off. *Id.* at 251–52. That list was sent to certain financial officers including David Myers, the company controller. *Id.* at 251. Plaintiffs alleged that Ebbers and Sullivan must have become aware of the list, or were severely reckless in not doing so, because Myers directly reported to Ebbers and Sullivan. *Id.* at 251–52. The court rejected the argument, holding that the PSLRA did not allow "the plaintiffs to make a conclusory assumption that simply because a monthly report was generated and distributed to an individual who reported to Ebbers and Sullivan, Ebbers or Sullivan had knowledge of certain delinquent account information which may appear in monthly reports." *Id.* at 252. Instead, the court suggested that plaintiffs should have alleged, for example, that Myers presented or discussed the report with Ebbers and Sullivan. *Id.*

The specifics of this case make the inference that Reese actually looked at Well #4's data tenuous. CW4 testified that each week ATP's executives would receive a productivity report listing both company-wide metrics and individual well data. For Reese to determine that Well #4's productivity had fallen, he would have had to open not only the email from CW4's staff containing the productivity report, but also open the productivity report, parse

10

through data for ATP's other hundred or so wells, find the data for Well #4, and then notice that the data differed from his August statements in a material way.  Absent an allegation that Reese was alerted to the Well #4 data in some way, inferring that Reese took those steps is less plausible than inferring that he would not have read specific entries in the emailed reports.

Indeed, the allegations in the Complaint suggest that Reese may have had good reason not to look at the reports without prompting.  CW4, the person charged with creating the production reports, never reported directly to Reese.  Additionally, Reese did not attend the weekly production meetings where the reports were discussed.  Instead, CW4 reported to George Morris, the Chief Operating Officer, and Morris attended the production meetings.  These allegations indicate that Morris, not Reese, was charged with monitoring production, and accordingly, strengthen the inference that Reese would likely not have read the weekly production reports absent some basis for him to do so.[1]

Third, Reese's position in the company does not aid Plaintiffs' scienter allegations.  As a general matter, "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams*, 292 F.3d at 432 (citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)).  However, in *Nathenson*, we held that occasionally "special circumstances" would permit a plaintiff to plead scienter by pleading a defendant's position in the company.  267 F.3d at 425.

> The 'special circumstances' cases exhibit some combination of four considerations that might tip the

---

[1] In short, the Complaint here alleged facts that undercut the inference that Reese read the Well #4 production data.  Accordingly, we have no occasion to decide, as a general matter, when an executive can be charged with knowledge of specific facts based on the allegation that the executive received an email containing those facts.

> scales in favor of an inference of scienter. First, the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day operations. Second, the transaction at issue may have been critical to the company's continued vitality. Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker. Fourth, the defendant's statements were internally inconsistent with one another.

*Diodes*, 810 F.3d at 959 (internal citations omitted).

The "special circumstances" exception does not apply here. First, with over 60 employees, ATP was approximately twice as large as the companies in the cases where this court has found a "special circumstance." *See Nathenson*, 267 F.3d at 425 (32 to 35 employees); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (no employees). Second, Well #4 was not material enough to place this case into the "special circumstances" category. That is not to say that Well #4 was not important to ATP. ATP's own August 24, 2011 report indicated that Well #4 was projected to produce 22.5% of ATP's total output. However, this court's jurisprudence requires more. Indeed, this court has previously found that the "special circumstances" doctrine was not implicated by statements concerning an asset that comprised 22% of the respective company's total portfolio. *See Jastrow*, 789 F.3d at 540 ("Defendants' alleged misstatement of the MBS portfolio valuation was not as crucial to the continuing operation of Guaranty as were the misstatements regarding the patent's applicability in *Nathenson*. Although Guaranty's non-agency MBS portfolio was undeniably a large and important business asset, it is not alleged to have been Guaranty's single product, instead comprising at all relevant times no more than 22% of Guaranty's total assets."); *see also Abrams*, 292 F.3d at 438 (Parker, J., concurring). Third, as explained above, Plaintiffs'

allegations fail to create a strong inference that it would have been readily apparent to Reese that his re-articulation of the August 24 report materially misstated Well #4's true production. And, last, Plaintiffs concede that Reese's statements were not internally inconsistent with other ATP speakers. Taking all these factors together, we conclude that Plaintiffs have failed to plead facts that would make this a "special circumstances" case.

In short, viewing Plaintiffs' allegations as a whole, we agree with the district court that Plaintiffs failed adequately to allege scienter with regard to Reese's statements.

**B. Liquidity and Clipper**

From 2010 to 2012, Defendants represented, in various ways, that ATP had sufficient liquidity to meet its capital needs. For example, in September 2011, Reese stated that ATP had a "solid capital position," and in April 2012, Reese stated that "[l]iquidity is sound." Defendants further opined that ATP had sufficient capital to fund the Clipper project, which Defendants represented would add significant production. Plaintiffs allege that each of these statements was false and misleading because ATP's capital position crumbled from 2010 to 2012 such that it had no hope of completing the Clipper project. Even if the statements were false, we hold that Plaintiffs failed adequately to plead scienter.

First, the fact that ATP continuously disclosed its worsening cash position belies a claim of scienter. From 2010 to 2012, ATP's financial statements and the notes that accompanied them repeatedly warned investors that ATP had negative working capital and that ATP was financing its short-term cash or service needs by ceding shares of its long-term profits. It would have made little sense for Defendants to simultaneously disclose to, and mislead, the public about ATP's liquidity position. For this reason,

13

"[a]dditional transparency . . . further negates the inference of scienter." *Jastrow*, 789 F.3d at 541; *see also Diodes*, 810 F.3d at 960.

Second, the nature of ATP's cash position undercuts Plaintiffs' scienter allegations. There were ample grounds to disagree about the state of ATP's finances from 2010 to 2012. As the company itself explained in May 2012, "[i]n the event we do not achieve the projected production and cash flow increases [from ATP's planned future projects], we will attempt to fund any short-term liquidity needs through other financing sources[.]" However, the company warned that "there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs." Thus, ATP's financial condition by 2012 was essentially a disclosed bet on future production. ATP had highly leveraged its future cash flows to continue production and exploration. This placed a great deal of pressure on the limited number of producing wells that ATP operated. Indeed, the pressure on ATP's production was so great that, according to ATP's first quarter 2012 Form 10-Q, any significant disruption to its business "could have a material adverse effect on . . . [ATP's] ability to meet [its] commitments as they come due." Nonetheless, if ATP had been able to bring its planned new production online, it could have secured significant increased revenue. Certainly, a reasonable investor could have looked at this situation and concluded that ATP's financial condition was untenable. Indeed, some investors did precisely that; for example, Moody's issued a report in September 2011 suggesting that ATP had a "high likelihood" of restructuring. But that was not the only reasonable view of ATP's finances. If ATP could bridge its liquidity gap and begin to benefit from its planned new wells, the company could have tapped into significant revenue. Against this backdrop, Defendants were not required to "present an overly gloomy or cautious picture of the company's current performance[]" so

long as their statements were "reasonably consistent with reasonably available data." *Abrams*, 292 F.3d at 433.

Third, the timing of ATP's liquidity statements does not support an inference of scienter. It is true that in May 2012, ATP indicated that it was within its financing capability, and three months later, ATP declared bankruptcy. Plaintiffs argue that this temporal proximity establishes scienter, citing to *Plotkin*, 407 F.3d 690. In *Plotkin*, the court noted that "allegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation. For example, the fact that a business files for bankruptcy on 'Day Two,' may, under the right surrounding circumstances, provide grounds for inferring that the business was performing poorly on 'Day One.'" *Id.* at 698 (citing *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000)). However, *Plotkin* does not aid the inference of scienter here because ATP disclosed its capital position in May 2012. That is, the inference that *Plotkin* endorses would allow the court to infer that ATP had potential liquidity problems in May 2012. However, that inference says nothing about Defendants' scienter because ATP disclosed those liquidity concerns. The same is true with regard to ATP's decision to hire bankruptcy counsel in June or July of 2012. ATP had disclosed its liquidity problems to the market in May 2012. The fact that a month later ATP would consult bankruptcy counsel hardly indicates that ATP's executives knew that they would run out of cash. Indeed, many companies engage bankruptcy counsel to explore restructuring options before management is sure that the company will fail. *See, e.g.*, Richard M. Cieri, *The Role of a Restructuring Lawyer*, *in* Arthur J. Abramowitz Et. al. Inside the Minds: The Art and Science of Bankruptcy Law, http://www.gibsondunn.com/fstore/documents/pubs/Cieri_Restructuring_Law yer.pdf ("The goal of a restructuring lawyer is to stay out of bankruptcy. Therefore, a restructuring lawyer is successful when a company never has to

commence a bankruptcy case. In the vast majority of cases, bankruptcy should be the last option because it is a very difficult and expensive process.").

Fourth, and for similar reasons, neither the bankruptcy trustee's allegations, McCarroll's assessment of ATP's financial conditions, the Confidential Witnesses' assessments of ATP's liquidity, nor the Bankruptcy Judge's determination that ATP filed bankruptcy too late established an inference of scienter. The fact that others disagreed with Defendants' assessments of ATP's liquidity does not indicate that Defendants' assessments were not truly or reasonably held. *See, e.g.*, *Jastrow*, 789 F.3d at 545 (finding that a Confidential Witness's disagreement with management about whether to rely on ratings agencies did not contribute to an inference of scienter); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009), *as amended* (Feb. 10, 2009) (finding that "disagreement among employees with regard to the proper scrap rate, is not enough to establish a cogent or compelling scienter allegation").

Fifth, Plaintiffs' motive allegations do not support an inference of scienter. Plaintiffs contend that the motive to raise capital here was more than typical because ATP needed to raise funds to continue its operations. Here, ATP's opportunity to mislead potential capital partners was severely limited by ATP's continuous disclosure of its liquidity position. Moreover, the fact that Plaintiffs have not alleged that Defendants themselves profited from their alleged misstatements undercuts a motive allegation. *See Jastrow*, 789 F.3d at 545 n.18; *Nathenson*, 267 F.3d at 421 ("[T]he fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim." (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).

Again, viewing the Complaint as a whole, we hold that Plaintiffs' allegations of scienter as to ATP's liquidity and the Clipper project fail as a matter of law.

## C. McCarroll's Resignation

On June 1, 2012, ATP issued a press release announcing that Matt McCarroll had been hired as CEO, replacing Defendant Bulmahn. Six days later, on June 7, 2012, ATP issued a second press release announcing that ATP "was unable to reach a mutually agreeable employment agreement with Mr. McCarroll and effective today he has submitted his resignation." Plaintiffs contend that the reason given for McCarroll's resignation was false or misleading.

However, nothing in the Complaint indicates that McCarroll informed either Bulmahn or Reese, or indeed anyone at ATP, of his reason for resigning. For example, when McCarroll claimed that he recommended restructuring but the Board declined, he did not indicate that he conditioned his employment on the Board restructuring. Likewise, when McCarroll told a private investigator that ATP's finances were a disaster, he did not indicate that he made that statement to anyone at ATP or that he told ATP that he resigned because of the company's financial condition. Absent some allegation that McCarroll informed someone at ATP why he resigned, there is no basis for the court to conclude that Bulmahn and Reese knew or were reckless in not knowing McCarroll's "true" reasons. *See Southland*, 365 F.3d at 361 ("[W]e will not 'strain to find inferences favorable to the plaintiffs.'" (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).

We AFFIRM.